# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DANIEL FIGUEROA-RANGEL,<br><br>Defendant. | 2:10-cr-00168-JCM-RJJ<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**<br><br>Defendant's Motion to Suppress Statements for Fifth Amendment Violation (#41) |

This matter comes before the Court for an evidentiary hearing on Defendant's Motion to Suppress Statements for Fifth Amendment Violation (#41). The Court also considered the Government's Response (#46) and Defendant's Reply (#52), as well as the testimony and evidence presented at the hearing.

## BACKGROUND

On March 30, 2010, members of the Las Vegas Metropolitan Police Department's (LVMPD) Narcotics Unit were observing a methamphetamine deal between Defendant, Daniel Figueroa-Rangel, and an undercover LVMPD detective. After the deal was completed, Figueroa got into the backseat of a blue Dodge Intrepid that headed north on Las Vegas Boulevard.

**A. The Stop**

Detectives James Burns and James Murray were assigned to follow and stop any vehicles that left the premises of the drug deal. Detectives Burns and Murray, both in unmarked vehicles, followed the Intrepid North on Las Vegas Boulevard, then East onto Owens Avenue. After following the car for about three-quarters of a mile, Detective Murray got behind the Intrepid and

turned on his lights and siren. The Intrepid did not immediately stop, so Detective Burns pulled his vehicle in front of the Intrepid, to prevent it from fleeing. The Intrepid continued slowly for several seconds, but finally stopped without any contact with other vehicles.

Three officers in separate cars were involved in the stop. Each officer was armed and identifiable as a police officer. Once the Intrepid was stopped, Detective Murray got behind his vehicle's door, drew his gun, and focused on the driver. He was able to observe the entire scene. Detective Burns approached the Intrepid from the front, pulled open the doors and ordered everyone to exit the vehicle.

Burns handcuffed Figueroa and then took him to the rear of the car while other officers handled the other persons in the car. Once at the rear of the car, Detective Burns performed a pat down search of Figueroa, and went through Figueroa's pockets. He found the money used by the undercover officer to purchase drugs, a wallet, and an owe sheet.[1] After the pat down search, Figueroa and the other two suspects were moved near the chain-link fence surrounding Woodlawn Cemetery in order to be away from the street. Detective Burns then put on gloves and searched the Intrepid.

Figueroa, still handcuffed, was then taken to Detective Murray's unmarked Ford F-150 and was driven back to the apartment complex where the sale occurred, and where other officers were executing the search warrant at Figueroa's residence. Detective Murray did not speak with Figueroa during the drive. Once they arrived, Detective Murray left Figueroa with other officers behind the complex and went into the apartment unit to participate in the search for evidence. Detective Murray did not have any contact with Figueroa after that. Both detectives testified that Figueroa's demeanor was calm at all times, and that he never exhibited any fear or nervousness. Each further stated that, to their knowledge, Figueroa was never mistreated during the arrest or during his transportation.

Figueroa's account of the incident differs significantly from the detectives' testimony.

---

[1] An owe sheet is a document used by drug dealers to record and track sales.

Figueroa contends that six cars were involved and that the passengers in the vehicle were instructed to exit the vehicle one by one. First the driver, then the female passenger, and finally Figueroa. Once out of the vehicle, Figueroa was handcuffed and taken to the fence around the cemetery. Detective Burns then put on gloves and began to search Figueroa all the while yelling, "Where's the money?" Detective Burns pulled out Figueroa's wallet, then loosened Figueroa's pants and started searching his buttocks area. Figueroa asserts that Detective Burns then inserted his fingers into Figueroa's anal cavity causing him to bleed.

Figueroa also asserts that when Detective Murray drove Figueroa back to the apartment complex he began teasing Figueroa, saying that Figueroa was in big trouble, that he was screwed, and that he was going to get twenty-five years in prison. Meanwhile, Figueroa claims he was in pain and bleeding from his anus. Figueroa never mentioned that he was bleeding to the detectives because he felt embarrassed and did not think the police would do anything even if he told them. Figueroa also testified that his previous contact with police officers, including arrests, had been positive experiences.

At the apartment complex Detective Steven Grammas, the agent on the case, gathered information from Figueroa and the other two Intrepid passengers, including names and dates of birth. Afterwards, Figueroa was transported to the Drug Enforcement Agency (DEA) offices to be interviewed.

**B. The Interview**

When Figueroa arrived at the office, his handcuffs were taken off so he could be booked. According to Figueroa, he was handcuffed again and moved to a holding room for about two hours. When the interviewers were ready, Figueroa was moved into the interview room, which was a small room with a medium-sized table and chairs. The interview was conducted by Detectives Grammas and Paul DeAngelis, with Ana Campang interpretering. Figueroa avers that he was handcuffed for the duration of the interview, contradicting the testimonies of the detectives and Campang.

Figueroa was given the Miranda warnings. Campang told Figueroa that she would be reading him his rights and that he would have to sign the card after she read it to him. Campang read the Miranda rights to Figueroa in Spanish and provided him with a written copy of the Miranda warning, also in Spanish. After reading and hearing his Miranda rights, Figueroa acknowledged that he understood them. Campang told him to sign and date the card, which he did, but later said he signed because he felt like he had no choice.

After Figueroa signed the card and stated that he understood his rights, the detectives began questioning Figueroa. The interview lasted approximately thirty minutes. Figueroa made incriminating statements, including: 1) that he sells methamphetamine (including some information about inventory, procurement, and distribution) and 2) that he possesses guns for protection.

During the interview, the detectives encouraged Figueroa to cooperate and be truthful. The detectives and Campang did not observe any signs of fear or nervousness from Figueroa. They felt that he was extremely cooperative. They also noted that Figueroa's English was good enough for him to answer most of the questions in English without hesitation. They also stated that Figueroa was not handcuffed or otherwise mistreated during the interrogation. Campang said that Figueroa did not appear to misunderstand the interrogators' questions, and that he only spoke Spanish a few times in order to explain himself more clearly. Figueroa was very compliant, cooperative, and forthcoming during the interview.

At the hearing, Figueroa testified that the detectives pressured him into answering the questions in English. Figueroa claimed that his English is extremely poor, but he tried to answer the questions to the best of his ability. He stated that he planned to exercise his rights, stay quiet, and not to say too much, but he felt intimidated by the detectives' barrage of questions. Figueroa also claimed that he asked for human rights or a human rights representative, but his requests were denied. Lastly, he claimed that the detectives kept telling him that they knew everything and it was all in writing.

In sum, Figueroa argues that his will was overborne, and his incriminating statements were not voluntary because of the cavity search, the aggressive behavior of the police who arrested him, and the oppressive questioning during the interview. He is not challenging the sufficiency of the Miranda warning.

**DISCUSSION**

The Fifth Amendment states: "No person. . .shall be compelled in any criminal case to be a witness against himself. . . ." U.S. CONST. amend. V. A defendant may waive his Fifth Amendment rights and speak, but he must understand his rights and voluntarily waive them. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003). The government must show that the defendant knowingly and voluntarily waived his Miranda rights by a preponderance of evidence. *Colorado v. Connelly*, 479 U.S. 157, 169 (1986). A defendant's statements are involuntary if the totality of the circumstances surrounding the interrogation was such that the defendant's will was overborne. *United States v. Wright*, 625 F.3d 583, 603 (9th Cir. 2010).

In considering the totality of the defendant's situation, the court should evaluate the length of the interrogation, the location, its continuity, and whether any interrogation techniques used against the defendant offend Due Process. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003). Details about the defendant are also important, such as physical and mental health, education, and maturity level. *Withrow v. Williams*, 507 U.S. 680, 693 (1993). The finder of fact has broad discretion in determining credibility of witnesses. *Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828, 834 (9th Cir. 2011).

Here, Figueroa was interrogated by two detectives for 30 minutes while sitting around a table in a standard interrogation room. *Clark v. Murphy*, 331 F.3d 1062, 1073 (holding that an interrogation in a standard interview room is not coercive). Figueroa was not interrogated at the scene of his arrest, in Detective Murray's truck, outside his apartment building, or at any other time prior to entering the interrogation room. Though Figueroa testified that he was handcuffed, this court finds the contrary statements made by three other witnesses to be more credible.

5

The court finds that Figueroa is not a credible witness. For example, Figueroa alleged that he was compelled to speak in English during the interrogation. However, the detectives were only encouraging him to tell the truth. The encouragement came as the police were showing Figueroa that they knew he was not being truthful about where he lived:

> Det. Grammas: Yeah, you, you don't live there.
>
> Figueroa Rangel: Yeah.
>
> Det. Grammas: We know that. Let's, let's, let's not beat around the bush here, Daniel. I know you understand me perfectly fine, okay? You've been in the country long enough, you speak plenty fine English. So we're not even gonna play the game of, "I'm not sure what's going on."

Figueroa Statement at 5, attached as Exhibit 1 to Government's Response (#46). Encouraging a witness to tell the truth in an interrogation does not overbear the witness's will. *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997). The detectives were not opposed to Figueroa speaking in Spanish. When he did not quickly respond to a question, the detectives had Campang translate the question into Spanish. They did not yell at him or repeatedly ask the same question. The detectives did not interrogate him in English as a means to intimidate. His competent responses demonstrate that he was not confused by conversing in English.

Two other claims made by Figueroa support the court's finding that his testimony is not credible. He said the detectives refused a request for "human rights," and that they told him they already knew everything. The detectives never made those statements during the recorded interview. The detectives did not use any improper interrogation techniques to induce Figueroa's self-incriminating statements.

As he is not challenging the sufficiency of the Miranda warning, Figueroa's last argument is that the alleged anal cavity search overbore his will. This court finds that Figueroa's testimony regarding the cavity search is not credible. Detectives Burns and Murray each testified that no cavity search was performed. Figueroa did not appear to be in pain, afraid, or uncomfortable to any of the officials involved in his arrest or interrogation. Each testified that he was calm. A review of the audio recording of the interrogation confirms that Figueroa sounds calm. CD of

Audio Recording, Exhibit 2 to Hearing (#54). Figueroa also did not mention the cavity search to any officer during his arrest or booking. No evidence was presented of blood on his undergarments or his pants. No testimony was offered from anyone in support of his claim, including the other passengers in the Intrepid. The fact that Figueroa did not use evidence that would be available if his claim were true also weakens the credibility of his testimony. *See Singh v. Holder*, 638 F.3d 1264, 1268 (9th Cir. 2011) (holding that failure to present evidence that should have been easily available weakens credibility). There was no cavity search, and Figueroa's confessions were voluntarily made.

Even if the cavity search and alleged harsh treatment by the arresting officers took place, Figueroa's will would not have been overborne. In *Thomas v. State of Arizona*, 356 U.S. 390, 401 (1958), Thomas was being transported for questioning regarding a murder. *Thomas*, 356 U.S. at 395-96. Some unruly civilians lassoed him and another suspect three separate times around the neck and shoulders threatening to lynch Thomas, but the sheriff quickly defused the situation each time. *Id.* Three hours later, questioning began and the Thomas provided a detailed account of the murder which implicated the other suspect. *Thomas*, 356 U.S. at 396-97. After a night's rest, Thomas confessed to the murder. *Thomas*, 356 U.S. at 398.

The Court held that his confession was not coerced because 1) there was no "continuous relay questioning. . .incommunicado detention," or "psychiatric inducement;" 2) nothing about the defendant's intelligence, age, or health created doubt about the voluntariness of his confession; 3) his prior criminal arrests prevented the Court from considering him "an impressionable stranger to the processes of law;" and 4) the interval between his confession and the alleged mistreatment was also devoid of "coercive influences." *Thomas*, 356 U.S. at 401.

All of these things are true of Figueroa's arrest and interrogation. Figueroa was calm at all points from his arrest to his interrogation. He was interrogated for only thirty minutes, by two officers who did not mistreat him. At the hearing, he testified that his previous encounters with law enforcement had been positive, and there is nothing about his health, age, or intelligence that

would create doubt about the voluntariness of his interrogation. A Spanish interpreter was present to assist him. The interview was held three hours after the alleged cavity search and was not conducted by the officer that Figueroa accused of administering the cavity search. Even if the cavity search had taken place, the totality of circumstances surrounding Figueroa's interrogation does not show that his will was overborne or that the Miranda waiver was not voluntary.

## **RECOMMENDATION**

For good cause appearing therefore,

IT IS THE RECOMMENDATION of the undersigned Magistrate Judge that Defendant's Motion to Suppress Statements for Fifth Amendment Violation (#41) be **DENIED**.

## **NOTICE**

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 8th day of September, 2011.

_____
ROBERT J. JOHNSTON
United States Magistrate Judge